THOMAS S. HEATH, Respondent, v. B. F. TUCKER, Appellant.

Springfield Court of Appeals, February 6, 1911.

1. CONTRACTS: Assignments: Trusts and Trustees: Undue Influence: Setting Aside Transfer of Property. Plaintiff, a storekeeper, became heavily in debt and much worried over his business, and at his request defendant took over his store as assignee for the benefit of the creditors, and later defendant purchased from plaintiff his equity in the stock of goods. Plaintiff subsequently sued to set aside the alleged assignment for the benefit of the creditors and the transfer of his equity to defendant, on the grounds that the transactions were made at a time when he was not responsible mentally and that he had been unduly influenced by defendant, who occupied a fiduciary position. The evidence is examined *held* not 'sufficient to support the charge of fraud or undue influence, or to warrant the setting aside of the transfers made by plaintiff.

2. TRUSTS AND TRUSTEES: Duty of Trustee: Transaction Between Trustee and Beneficiary. A transaction between the trustee and *cestui que trust* is always scrutinized in a court of equity with a watchful eye, and will not be sustained to the disadvantage of the *cestui que trust*, except upon the most complete and 'satisfactory evidence of good faith and fair dealing on the part of the trustee.

3. ——: ——: ——. While the law exacts of a trustee the utmost good faith in all his dealings with the beneficiary regarding a trust fund, it has never been announced that such dealings are void and are to be held for naught at the instance of the beneficiary by the mere suggestion of the relationship.

4. ———: ———: ———: **Burden of Proof.** There is no differ-
ence in the treatment of dealings between trustee and *cestui
que trust*, than between strangers, except in the manner and
burden of proof. When the dealing is assailed in a proper pro-
ceeding, charging the trustee with unfairness or fraud, the bur-
den is upon the trustee to show that the transaction was open,
fair, honest and free from fraud on his part; while, in all other
cases, he who alleges and charges unfairness or fraud must
prove it.

5. ———: ———: ———: **Termination of Relationship: Offer to
Rescind.** It appeared from the evidence that during the rela-
tionship of trustee and *cestui que trust* existing between plain-
tiff and defendant, the defendant purchased from plaintiff his
equity in the trust property, but that later when no such
fiduciary relation existed and plaintiff complained of the
transaction, the trustee offered to trade back, which proposi-
tion the plaintiff refused. Later the rights of third parties
intervened and it was impossible to put the plaintiff in *statu
quo*. *Held*, in a subsequent action to rescind, or to require
defendant to account and pay more for the property, that
plaintiff could not recover.

6. ———: ———: ———: **Equity: Litigant Must Come With
Clean Hands.** A litigant coming into a court of equity must
come with clean hands, and so where a beneficiary sues to
rescind a contract made with his trustee, when he knows that
it is impossible to restore things to the situation they were in
at the time the contract was made, and it also appears that
the trustee had offered to rescind prior to the institution of
the suit, at which time the parties could have been placed in
*statu quo; held*, that it would not be fair or equitable to permit
plaintiff to sustain such action.

7. **EQUITY: Action to Rescind Contract: Plaintiff Must Show
Diligence.** When one comes into a court of equity to rescind a
contract on the grounds of fraud he must be able to show as a
primary condition to his right to rescind, that he has been
prompt and diligent in disavowing the obligation into which
he alleges he was fraudulently led.

Appeal from Hickory Circuit Court.—*Hon. C. H.
Skinker*, Judge.

REVERSED.

*J. W. Montgomery* and *Rechow & Pufahl* for appellant.

(1) The final settlement is conclusive of all matters embraced therein. May v. May, 189 Mo. 485; State ex rel. v. Carroll, 101 Mo. App. 110; Coulter v. Lyda, 102 Mo. App. 401; Park v. Jamison, 82 Mo. 552. (2) In any event the allowances were at least prima facie correct, and as they were not in the suit at bar attacked or shown to be unreasonable, should have been allowed. Ansley v. Richardson, 95 Mo. App. 332; State ex rel. v. Strickland, 80 Mo. App. 401; Clark v. Sinks, 144 Mo. 448; In re Meeker, 45 Mo. App. 186; Jacobs v. Jacobs, 99 Mo. 427. (3) A trustee may purchase from his *cestui que trust*. Sallee v. Chandler, 26 Mo. 124; Richards v. Pitts, 124 Mo. 602; State ex rel. v. Jones, 131 Mo. 210; Buford v. Aldredge, 165 Mo. 426; Kerr on Fraud and Mistake (1 Am. Ed.), 156; Evans v. Evans, 196 Mo. 1. (4) On an accounting where the trustee acted in good faith, he will be allowed for his services and responsibilities. Scudder v. Ames, 142 Mo. 232; Albert v. Sanford, 201 Mo. 117.

*W. S. Jackson, Henry P. Lay* and *W. A. Dollarhide* for respondent.

(1) A trustee who is guilty of fraud or misconduct is not entitled to compensation for his services or his expenses. 3 Amer. and Eng. Ency. Law (2 Ed.), 117; In re Hyman, 14 Daly (N. Y.) 375; Burrill on Assignments (4 Ed.), sec. 425; Newton v. Rebeneck, 90 Mo. App. 650. (2) Tucker was not entitled to recover his expenses in the former litigation of the matters involved in this case. Heath v. Tucker, 117 S. W. 125. Burrill on Assignments (4 Ed.), 634. (3) While it is true that under certain conditions a trustee may purchase the trust property from his *cestui que trust*, yet he does so at his peril, and the burden is upon him to

show to the satisfaction of the court that the utmost fairness governed the transaction. Evans v. Evans, 196 Mo. 1; Ryan v. Ryan, 174 Mo. 279; Barrett v. Ball, 101 Mo. App. 288; 28 Am. and Eng. Ency. Law (2 Ed.), 1020.

GRAY, J.—The plaintiff, on the 26th day of February, 1907, was, and for a long time prior thereto, had been engaged in the general merchandise business at the town of Weaubleau, in Hickory county, this state. He had become worried about his business affairs, and on said day conveyed his property to the defendant herein as assignee for the benefit of creditors. The property consisted largely of merchandise, and amounted to about $14,000, as shown by an inventory taken by the defendant as assignee, and was appraised at the value of $9-629.96, a sum largely in excess of the plaintiff's debts. After making the assignment, he formed the resolution of selling his equity in the property, and approached the defendant with the view of selling the same to him. After the plaintiff had made several propositions, they finally entered into an agreement, by the terms of which the defendant agreed to pay plaintiff for his equity, $2-200, which agreement was carried out by defendant paying $500 in cash and executing his note for $1700 for the balance, and plaintiff conveyed his equity to him. After this transaction, the defendant continued in charge of the estate as assignee under the deed of assignment from plaintiff to him, and made his final settlement with the court under the statute, as though he had not purchased the plaintiff's equity.

Shortly after the purchase of the equity, the defendant transferred one-third of the stock to one George W. Lindsey, and one-third to a Mr. Whitaker. The transfer was made by each of the parties paying to the defendant one-third of the $500 cash payment he had made to plaintiff, and by assuming and subsequently

paying one-third of the $1700 note defendant had given to plaintiff for the purchase of his equity.

When the defendant made his settlement, the plaintiff appeared and filed exceptions thereto, on the theory that the transfer of his equity to the defendant was void. The circuit court sustained the exceptions, and defendant appealed to the Kansas City Court of Appeals. The opinion of the Court of Appeals in the case will be found in 136 Mo. App. 347, 117 S. W. 125. The court reversed the judgment on the ground that the circuit court was without jurisdiction in the assignment proceedings to set aside the transfer of the equity. The court held the proceedings in the assignment matter were purely statutory and not equitable, and that on exceptions to the final report of the assignee only such matters as pertained to the administration of the estate in his hands were matters for investigation. The court reversed and remanded the cause with directions to the assignee to make final settlement in accordance with the views expressed in the opinion. The court further held that the validity of the transfer could only be attacked for fraud in its procurement in a proceeding in a court of equity.

After the cause had been remanded, the defendant made his final settlement in the circuit court. In that settlement he was charged with the sum of $10021.31. The value of the assets which came to his hands by virtue of the assignment was $9629.95. The assignee had purchased claims of certain creditors at a discount of $391.36, which added to the value of the assets, made the said sum of $10021.31. The assignee was allowed the following credits: $133.74 expenses of taking inventory and appraising the stock; the sum of $500 allowed to the assignee for services in making his bond and for attorney's fees up to and including the time of the purchase of the equity; the sum of $5249.80 on account of sums paid to creditors; the sum of $59.21 on account of certain due bills; the sum of $2200 being the amount

paid the plaintiff for his equity; the sum of $700 for attorney's fees and expenses in defending in the circuit court and on appeal against the exceptions filed by the plaintiff, and other small amounts aggregating $11.40, and leaving the amount due of $1167.16.

In the May term, 1909, of the circuit court of Hickory county, the present proceeding was instituted to set aside the transfer by plaintiff to the defendant of his equity in the assigned estate. The petition alleged that on the 26th day of February, 1907, the plaintiff was the owner of certain real estate and a stock of general merchandise and store fixtures in Weaubleau, then of the reasonable cash market value of $14500; that at said date and for sometime prior thereto, the plaintiff was engaged in business as a general merchant in said city, doing business under the style of T. S. Heath and Son, his son being only a nominal partner and having no actual interest in the business, and in conducting said business, the plaintiff had become indebted to creditors in the sum of $5162.40; that for a considerable time prior to said date, the plaintiff's health had been poor by reason of which, and of his business affairs, his mind became greatly perturbed and distressed, and he was wholly incapable of intelligently managing his affairs; that although he was wholly solvent and his business in a flourishing condition and very valuable, the plaintiff became possessed of the insane delusion that he was about to fail in business, and as a result thereof, he was likely to be imprisoned, etc; that realizing his impaired mental condition, and feeling the need of advice and assistance, he went to the defendant, who was a man of property, business ability and experience, and told him the situation of his affairs, and requested the defendant's advice and assistance, and in so doing relied upon the warm and confidential friendship which he believed existed between him and the defendant; that plaintiff desired and requested the defendant to become his agent and trustee for the purpose of taking charge of the busi-

ness and of managing the same until plaintiff had re-
covered his usual health of body and mind.

The petition further alleged that the defendant con-
sented to take charge of said business, but after con-
sulting his attorney, advised the plaintiff to make an
assignment to him of all of his property, although there
was nothing in the condition of plaintiff's affairs which
justified such action, yet by reason of plaintiff's distress-
ed condition of mind and his confidence in the defendant,
he consented to and did make the assignment to the
defendant; that the defendant at once took charge and
possession of the property and of the business, and pro-
ceeded to make an inventory which he completed on or
about the 12th day of March, 1907, and found from said
inventory the reasonable value of the property covered
by said assignment was $14566.51, and that the liabili-
ties of the plaintiff amounted to $5162.40, and that the
net value of the property was $9404.11; that "the de-
fendant desiring and intending to make an unlawful
and unconscienable profit for himself and wholly dis-
regarding his duties as trustee and as imposed by the
confidential relationship between himself and the plain-
tiff and seeking to take advantage of the derangement
of plaintiff's mind, the defendant entered into negotia-
tions with the plaintiff for the purchase of plaintiff's
'equity' in the assigned estate. That at the time the
plaintiff was temporarily insane and was wholly unable
to deal with the defendant upon an equal footing, and
had an entirely erroneous idea of the value of his prop-
erty, all of which was known to the defendant and of
which he sought to take advantage.

"That as the result of said negotiations and of
fraudulent misrepresentations made by the defendant
to the plaintiff as to the value of said property and of
the condition of said business, and of the confidential
relations existing between the plaintiff and defendant,
the plaintiff was induced by the defendant to execute
an instrument purporting to be a transfer and assign-

ment of all of plaintiff's 'equity' in the property aforesaid.

"That by reason of said false representations made by the defendant to the plaintiff, the mental condition of the plaintiff, the position of trust occupied by the defendant, and the confidential relationship between the plaintiff and defendant, the said instrument and pretended transfer is, and should be held void and should be set aside.

"Wherefore plaintiff prays that the said assignment and also the said pretended transfer of plaintiff's 'equity' in said property be set aside and for naught held; but it appearing from the premises that the rights of third parties have intervened, and that by reason of the manner in which the defendant has conducted said business, it will now be impossible to place the parties in *statu quo* by ordering the return of said property, it is therefore further prayed that the title to said property be vested in the defendant; that he be required to account for the value thereof," etc.

The defendant answered admitting the making of the deed of assignment, the transfer of the equity, the incurring of the expenses and making the payments set out in the previous part of this statement, and as shown by his settlement as assignee. The defendant further alleged that if the stock of merchandise had been sold at assignee's sale in due course of administration, the same would not have brought fifty per cent of the invoiced price. He further denied that the plaintiff was not able to take care of himself when the assignment and transfer of the equity were made, or that he took any advantage of the plaintiff, and expressly alleged that the plaintiff well knew at the time of the transfer of the equity, the appraised value of the property, as well as the inventory value and the amount of the indebtedness against the same; that about the time the inventory was completed, the plaintiff commenced importuning the defendant to buy his equity in the assigned property;

that for sometime the defendant refused to deal with the plaintiff, and continued to refuse to buy his equity until after the completion of the inventory and appraisement, and not until the plaintiff was well aware of the value of the property and the indebtedness against the same.

The trial court did not find that the plaintiff at the time the assignment was made was unable to take care of or manage his business affairs, but did find that at the time the equity was transferred, the mind of the plaintiff was in a greatly perturbed condition by reason of which and of the fiduciary relation existing between the parties, plaintiff was unable to deal with the defendant on fair and equal basis, and for that reason the transfer of the equity to defendant should be set aside. The court charged the defendant with the same amount he was charged with in his final settlement as assignee; and held he was entitled to credit for sums paid to plaintiff, and to others for plaintiff's benefit, aggregating $8054.15, leaving a balance of $1967.16, for which the defendant should account to the plaintiff, and rendered judgment against defendant therefor. From that judgment the defendant appealed to this court.

There are several charges in the plaintiff's petition wholly unsupported by the evidence. The plaintiff's business was not in a flourishing condition. He owed about $5000 then due, and the assignment was made at the very dullest season of the year. Realizing the situation the plaintiff had been for some time trying to induce others to go in with him and form a corporation to handle his business. He had sometime prior to the making of the assignment, made a trip to Oklahoma with the view of changing his location and quitting the mercantile business in Missouri. About two months previous to the assignment, he had transferred and delivered to his son-in-law, clothing out of the stock amounting to about $1500 for which the son-in-law gave notes payable to the plaintiff's wife. It is not

claimed in the testimony that the clothing was the property of the wife or that the notes were given to her for any indebtedness of the husband, and the same were not included in the assignment. Some time previous to February 26, 1907, a new store had opened across the street from plaintiff's, and there is testimony tending to prove that a share of the previous business of the plaintiff was being done by the new competitor.

There is no testimony in the case to support the allegation of the petition that the defendant induced or requested the plaintiff to make the assignment or that the plaintiff had any special confidence in the defendant. Prior to the making of the assignment and prior to the time he first met or talked with the defendant about the same, he had consulted with others in regard to the matter, and with the view of having some one take charge of his business and pay his debts. He approached defendant and requested him to become his agent for that purpose. The defendant did not consent to do so at first, but finally agreed to do so if matters could be fixed legally. The plaintiff and the defendant then went to the county seat and the plaintiff employed Mr. Montgomery, an attorney at law, and consulted him in and out of the presence of the defendant relating to his financial condition. As a result of the interview between the parties hereto and the attorney, the attorney advised an assignment and prepared the conveyance therefor.

At the time the assignment was made, the plaintiff was in consultation with his son-in-law and his said son, and they both admit in their testimony that they advised him to make the assignment.

There is no testimony in the case that the defendant in any wise requested or induced the plaintiff to sell him his equity in the stock. The only evidence as to the matter comes from the defendant and his witnesses. They agree that the plaintiff shortly after the deed of assignment had been made, was anxious to sell his equi-

ty, and offered the same to the defendant for the sum of $500; that the defendant refused to buy it and advised him it was worth more; that he then offered to take $1000 and the defendant refused to buy at that price. Finally he offered his equity for $2000 and the defendant agreed to take the same at that price, and prepared a contract by the terms of which the defendant agreed to pay $2000 for the equity, and to assume certain debts amounting to about $4500 and supposed to be all the debts owed by the plaintiff.

The plaintiff did not accept the instrument as prepared by the defendant, but wrote another himself, by the terms of which the defendant was to pay him $2200 for his equity and to assume and pay all the debts of whatsoever kind of Heath and Son, or of the plaintiff individually.

After the parties had verbally agreed to the purchase of the equity at $2000 and the payment of all debts, the plaintiff learned the defendant had made arrangements for discounts from certain of the creditors, and thereupon he demanded that defendant pay him the additional sum of $200 as his proper part of such discount. In addition to the $2200 the defendant also agreed to buy a stove for the plaintiff's wife, not to exceed the sum of $50.

The evidence further shows that after the assignment had been made, and while the inventory was being taken, representatives of certain creditors called to look after their accounts, and in the presence of the plaintiff stated that the plaintiff's assets were largely in excess of his liabilities, and that he was not in such bad shape financially.

The evidence further shows that some time after the purchase of the equity by the defendant, the plaintiff became dissatisfied and called to see the defendant, and the persons who had purchased an interest with him, relating to the transfer, and requested that the defendant pay premiums which would come due in the future,

on life insurance policies carried by the plaintiff. The defendant and his associates refused to make any further payment, and thereupon notified the plaintiff that if he was dissatisfied with the transfer of his equity, that he could have the property turned back to him if he would redeliver to the defendant the note defendant had made him, and repay the $500 he had received. The plaintiff refused to do so, and said he did not want the property back.

There is no testimony in the case supporting the charge of false representations made by the defendant to the plaintiff to induce him to make the assignment or to execute the instrument transferring his equity. No testimony was offered tending to prove that defendant at any time made any undue statement or false representation to the plaintiff, and if the transfer is to be set aside, it must be on the ground that plaintiff's mind was in such condition that he was unable to contract, considered with the fact that a fiduciary relation existed between him and the defendant.

The evidence offered by plaintiff tends to prove that about the time of the execution of the deed of assignment, the plaintiff became much worried about his financial matters. He had been a merchant for many years, and had enjoyed the reputation of being one of the good and substantial citizens of his community. Suddenly he found himself confronted with an indebtedness of over $5000 then due, and no money to meet it. He also realized that his only way to get money to pay his debts was from the sale of his goods; and that such sales must be made in the very dullest season of the year. He had transferred to his son-in-law a part of his stock of goods and the notes in payment therefor. had been executed to and delivered to his wife. His situation greatly wounded his pride and worried him until he had become nervous and changed in his usual habits and appearance. He was in poor health and realized that he was well in the afternoon of life, and

perhaps would be unable to remove the financial clouds hanging over him. He was not insane, and no advantage was taken of him by the defendant in procuring the assignment of the equity in the estate.

There is nothing in the record to justify a court in holding the original deed or assignment invalid. And if the assignment of the equity is held invalid, it must be solely upon the ground that the condition of the health and mind of plaintiff at the time it was made, was such as to invalidate the transaction when scrutinized by the very suspicious view which courts take of transactions between trustee and *cestui que trust.* It is the language of all the authorities that such a transaction is always scrutinized in a court of equity with a watchful eye, and will not be sustained to the disadvantage of the *cestui que trust,* except upon the most complete and satisfactory evidence of good faith and fair dealing on the part of the trustee.

In passing on the issues, we are not to deal with evidence showing any intentional wrong on the part of the trustee, or of any failure on his part to fully disclose to the beneficiary all information he had relating to the trust estate. There was no intentional concealment, no misrepresentation, no actual fraud. The issues to be determined arise from the very conception and existance of a fiduciary relation. It may also be observed that the issues in this case are not to be confused by the law relating to dealings by the trustee wherein he, as trustee, conveyed the property to himself.

"While the law exacts of a trustee the utmost good faith in all his dealings with the beneficiary regarding the trust funds in his hands, and commands him, on account of the fiduciary relation, to make full, fair, and open disclosures of all facts in his possession, it has never yet been announced that all dealings in regard to the trust fund are void and to be held for naught, in a court of law, at the mere suggestion of the relationship of the parties by the beneficiary. The office of

trustee is no mere pitfall into which any scheming, exacting, or traitorous beneficiary may throw the trustee at pleasure. There is no difference in the treatment of dealings between trustee and the *cestui que trust*, or the fiduciary with his beneficiary, than with strangers, except in the manner and burden of proof when the dealing is assailed in a proper proceeding charging to the trustee or fiduciary unfairness or fraud. Under these circumstances, the burden is upon the trustee or fiduciary to show that the transaction was open, fair, honest, and free from fraud on his part, whereas in all other cases he who alleges and charges unfairness or fraud must prove it." [State ex rel. v. Jones, 131 Mo. l. c. 210, 33 S. W. 23.]

In Sallee v. Chandler, 26 Mo. l. c. 129, SCOTT, Judge, speaking for the Supreme Court of this state, said: "However, a purchase by the trustee from his *cestui que trust* is at all times a transaction of great nicety, and one which the courts will watch with the utmost diligence. A trustee may purchase from the *cestui que trust*, provided there is a distinct and clear contract, ascertained to be such after a jealous and scrupulous examination of all the circumstances, that the *cestui que trust* intended the trustee should buy, and there is no fraud, no concealment, no advantage taken by the trustee of information acquired by him in the character of trustee. It will rest with the trustee to establish in evidence that there was such a bona fide contract between them, as according to the rule just referred to, will sustain the purchase in a court of equity. The court, if satisfied as to this evidence, will support the transaction; but if any unfair advantage has been taken by the trustee by withholding information or other fraudulent dealing, the purchase will at once be set aside; and mere inadequacy of price will go a great way in the mind of the court to constitute such fraud, though

153 App—24

the purchase will not necessarily be set aside on that account alone."

This court has always given full credit to the finding of facts of the trial court in equity cases. In this case, however there is but little dispute between the witnesses as to the material facts in the case. The fact that plaintiff was greatly worried over his financial situation, and to the extent that his health had become impaired, and he was very nervous and could not sleep, has been determined by two trial courts. And it is only from the fact that this issue has been found in favor of the plaintiff by two trial courts, that we refuse to make a contrary finding. The plaintiff was dissatisfied with the terms of the agreement that defendant had prepared to evidence the transfer of the equity, and prepared one himself, which is contained in the pleadings in this case, and an examination thereof will show that it was prepared by a man able to take care of himself. In addition to the business intelligence disclosed in the preparation of this instrument, the plaintiff, when he learned that defendant had contracted for certain discounts on debts due merchants, demanded and required defendant to pay him an aditional price for his equity on account thereof. He even found fault with the rate of interest he was to receive from defendant on the deferred payments, and demanded the highest rate of interest allowed by the laws of this state. When he executed the assignment paper, the inventory was about completed, and he knew as well as the defendant, the inventory value of his estate. He was surrounded by his son, who was his partner in the business, and by his son-in-law, who had also been connected with the stock of goods and had a general knowledge of the value thereof. His health was poor and he was willing, perhaps, to take less than the actual value of the property in order to get away from the embarrassing surroundings and from the worry of his unfortunate financial condition. He turned to the defendant and urged him

to buy the stock, which the defendant first refused to do. The plaintiff was also advised by the representatives of the wholesale houses to whom he was indebted, that his stock was largely in excess of the payment of his debts.

The plaintiff has never testified in any of the courts relating to the transaction. And there is no showing that his testimony could not have been procured. He has refused, at all times, to advance any money to pay the expenses of the litigation with the trustee, but has required of his attorneys the payment thereof. Two trial judges, however, have held that his condition was such, that regardless of any improper conduct on the part of the trustee, the transfer should be set aside, and while we have some doubt in the matter, we do not feel justified in overruling the trial courts thereon, unless the subsequent conduct of plaintiff requires such action.

The defendant in his answer, alleged that after the relation had ceased and the plaintiff was acquainted with all the facts and circumstances, and while defendant was in possession and control of all of the assigned estate, the plaintiff expressed his dissatisfaction with the transfer and demanded some additional consideration therefor, but defendant refused to pay the additional consideration, and notified plaintiff that he could have his option to return the $500 in cash he had received and redeliver the note he had received for the transfer of his equity, and all the property would be returned to him. But plaintiff, with such knowledge, refused to repay the money or deliver the note, but kept and retained the same and collected the note and the interest thereon.

The allegation of the answer is sustained by the uncontradicted testimony in the case. The evidence shows not only that the defendant made the offer above set forth under the above conditions, but also that plaintiff afterwards went to the person to whom defendant

had transferred one-third of the property, who made the same offer, and it was rejected by plaintiff. When such offers were made there was no fiduciary relation existing between the plaintiff and the defendant. The plaintiff then had full knowledge of every detail of the situation and acted independently of any confidential relation, and was dealing with the defendant and his associate as strangers.

While it is true where relation which presupposes a confidence or controlling influence by one party on the mind of another, has existed, the influence acquired by such relation may extend more or less after the period of its termination, and when such is the case, the transaction will be scrutinized with the same jealousy as if the relation continued. Yet it is only where the evidence shows that such influence extended after the period of the confidential relation, that the principle applies.

In deciding this issue, the doubt entertained by the court of the right to set aside the transfer of the equity on account of the circumstances under which it was made, has substantial weight. If the plaintiff had been wronged in the original transaction, he was fully aware of it at the time the defendant offered to rescind. The fiduciary relation no longer existed, and there is nothing in the record to show, that it once existed, had any influence at the time defendant offered to rescind. The plaintiff was then holding fast to all he had received and refusing to put the defendant in *statu quo,* but was demanding the defendant to make a new contract with him and buy his property at a higher price.

The plaintiff instituted this suit in equity to rescind the contract at a time when he knew it was impossible to restore things to the situation they were in at the time the contract was made. The evidence shows that while it was possible so to do, he at all times maintained that he did not want a restoration. It is well settled that a litigant coming into a court of equity,

must come with clean hands, and the rule is applicable to the facts of this case. The defendant acted in good faith in the transaction, and made a contract at the request of the plaintiff. Afterward, and at a time when the defendant was in a position to restore to plaintiff what he received under the contract, plaintiff expressed a dissatisfaction therewith, whereupon the defendant offered to rescind the contract and restore to plaintiff all he had parted with, to-wit: The stock of merchandise. To that offer, the plaintiff replied: "I don't want it; it would be only the tail end of a big stock of goods and I would not fool with it." This reply was made to the following statement of the defendant: "If you are dissatisfied with this trade, you give me back my $500 and give me back my note and you can have the whole thing back, Mr. Heath; you can have whatever it brings or you can let me pay out what is owing and you can have the remainder of the goods." And to this day no word of testimony has ever come from the plaintiff that he ever desired to rescind the contract or wanted the stock of goods returned to him.

A fair interpretation of the evidence leads to the irresistible conclusion that plaintiff never wanted the possession of the stock after the transfer of his equity, and there was no time when he was willing to give up the $500 cash paid him and the $1700 note drawing eight per cent interest for his equity in the stock.

It does not seem to us that it would be fair or equitable to permit the plaintiff to sustain this action. When he became dissatisfied with the trade and the defendant offered to rescind and return to him the property, he should have accepted the proposition. He had no right to remain silent, and if for any reason, defendant lost money on the transaction, to stand by the contract; but if defendant made money out of the transaction, repudiate it. To hold that he can recover under such circumstances, is declaring an unjust and unfair rule, and especially so under the facts of this case.

The contract was not void but only voidable at the election of the *cestui que trust,* and if at a time when the elements which made the contract voidable had been removed, plaintiff refused the offer of the defendant to rescind and really did not want to rescind, he certainly can have no standing in a court of equity to compel the defendant to rescind when he has ascertained it will be more profitable to him to do so, than to stand by the contract.

"When one comes into a court of equity to rescind a contract he must be able to show as a primary condition to his right that he has been diligent and that he has been prompt in disavowing the obligation into which he alleges he had been fraudulently led. Negotiations or dealings with the fraudfeasor, respecting the subject-matter of the fraud after discovery, are fatal to the right of repudiation. The party alleging he was defrauded 'is not at liberty to hesitate and delay, and wait for a future view of his own convenience or the market value of the property.'" [Landon v. Tucker, 130 Mo. App. 704, 107 S. W. 1037.]

The premises considered, we are of the opinion that when all the evidence is considered, the plaintiff is not entitled to recover in this action, and the judgment should be reversed with directions to the circuit court to dismiss plaintiff's bill. It is so ordered. *Nixon, P. J.,* concurs; *Cox, J.,* not sitting.